IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Crim. No. 11-065-SLR |
| ) | |
| JARON SMULLEN, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM ORDER**

**I. INTRODUCTION**

On June 16, 2011, a federal grand jury returned a one-count indictment with notice of forfeiture against defendant Jaron Smullen charging possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1), and 924(a)(2). (D.I. 9) Defendant has moved to suppress statements and evidence seized as a result of a warrantless stop and frisk conducted on May 25, 2011. (D.I. 11) An evidentiary hearing was held on August 18, 2011, with the two law enforcement witnesses.[1] (D.I. 18) The matter is fully briefed. (D.I. 19, 20, 21) The court has jurisdiction pursuant to 18 U.S.C. § 3231.

**II. FINDINGS OF FACTS**

Pursuant to Federal Rules of Criminal Procedure 12(d), the following constitutes the court's essential findings of fact.

---

[1] Wilmington Police ("WP") Detective Sam Smith ("Smith") and Delaware Department of Probation and Parole ("DPP") Officer Bryan Vettori ("Vettori") testified on behalf of plaintiff. (D.I. 18)

1. On May 25, 2011, at approximately 8:00 p.m., members of Operation Safe Streets ("OSS") reported to 2405 Madison Street, Wilmington, Delaware ("the residence")[2] to arrest Orron Smullen[3] and conduct an administrative search of the residence. (D.I. 18 at 3-5) Nine OSS officers responded to the residence, including Smith,[4] Vettori,[5] DPP Officer Loose, WP Detectives Lewis and Leary and WP Sergeant Looney. (*Id.* at 5, 44)

2. Consistent with OSS protocol for arrests and administrative searches,[6] Vettori and Loose went to the front of the residence, while Smith responded to the backyard to

---

[2] The residence is a two-story brick town home with an apartment on the first floor and an apartment on the second floor. (*Id.* at 8; GX1) The second floor apartment has a back door leading outside to a covered porch. (GX2, GX4) Adjacent to the porch is a fire escape staircase that empties into the backyard. Toward the rear of the backyard, there is an alleyway that leads out to a street. The residence is located in a high crime and drug area. (*Id.* at 8, 17)

[3] Orron Smullen ("Orron") is defendant's brother. At the time of the events at issue, defendant and Orron lived together at the residence. (*Id.* at 24) Orron was a level three probationer and defendant was a level two probationer, both under supervision by DPP. (*Id.* at 50; GX5) Defendant signed a form outlining the conditions of his probation on November 3, 2010. (GX5) Condition three provided: "You must report to your supervising officer at such times and places as directed, and permit the probation/parole officer to enter your home and/or visit your places of employment." (*Id.*)

[4] Smith, a seven-year veteran of WP, has worked with OSS for approximately one year. (*Id.* at 4, 21) During his career, Smith has made hundreds of arrests, including 15 for firearm possession. (*Id.* at 4)

[5] Vettori is a DPP officer assigned to the OSS task force. (*Id.* at 42-44) His responsibilities include providing "support services to standard caseload officers" and conducting home visits, curfew checks, searches and arrests of probationers. (*Id.* at 43) Prior to May 25, 2001, Vettori had been to the residence on two occasions for curfew checks. (*Id.* at 46)

[6] OSS protocol instructs officers to respond to the front and back of a residence to prevent someone from fleeing from a back door. (*Id.* at 7)

2

monitor anyone attempting to flee through a backdoor. (*Id.* at 7, 9, 11; GX2, GX3) The remaining OSS officers assumed positions around the front and to the side of the residence. (*Id.* at 46) Smith, wearing plainclothes and a vest with a "POLICE" placard, stood in the backyard, about twelve feet from the residence. The backyard was dimly lit. (*Id.* at 8, 11-12)

3. From his vantage point, Smith heard a knock on the front door. (*Id.* at 45-47) A few seconds later, Smith observed an unidentified individual[7] walk out the back door onto the porch. (*Id.* at 12, 25) Defendant was not wearing a shirt. (*Id.* at 25) Defendant responded, "Who is it?" (*Id.* at 12, 46) Loose yelled back, "It's probation and parole. Come to the door." (*Id.* at 13, 47)

4. Defendant walked back inside the residence and remained there for about 30 seconds. (*Id.* at 13-14, 26) Then, defendant - now wearing a shirt- walked back onto the porch and turned quickly toward the fire escape staircase. (*Id.* at 13-14, 27) Defendant started to descend the staircase. (*Id.* at 13-16)

5. Smith surmised that defendant was trying to flee the residence to avoid OSS. Alone in the dimly lit backyard where two probationers were known to reside in an area he knew had a high incidence of crime and with an unidentified male moving closer with each descending step, Smith became concerned for his safety. (*Id.* at 14-15, 17, 29-

---

[7]Because Smith positively identified this individual as defendant at the evidentiary hearing, all references shall be to "defendant." (*Id.* at 12) However, Smith testified that at no time during the events at issue did he recognize defendant. (*Id.* at 32) Smith had met defendant once previously and knew that he was on probation. (*Id.* at 6-8, 37, 45) Smith had met Orron several times and knew his criminal history included firearm and drug offenses. (*Id.* at 7, 21)

3

32) As defendant descended the second step, Smith identified himself, unholstered his taser and pointed it directly at defendant. (*Id.* at 14-15, 29-32) Smith ordered defendant to raise his hands and slowly walk down the staircase. Defendant immediately complied and stated, repeatedly, that he lived at the residence. (*Id.* at 16)

6. Smith observed that defendant was stuttering and his body shaking. (*Id.* at 15) Smith, taser drawn, approached and ordered defendant to his knees and applied handcuffs. (*Id.* at 16-18, 33) Smith radioed for backup assistance. (*Id.* at 18, 34)

7. Contemporaneously, Vettori recognized Orron walking toward the front of the residence. (*Id.* at 48) When Orron reached the front door, Vettori took him into custody without incident. (*Id.* at 48, 56) While handcuffing Orron, Vettori heard Smith's radio broadcast about someone exiting the residence down the fire escape staircase. (*Id.* at 57)

8. Detective Lewis and Sergeant Looney responded to the backyard, with Vettori following shortly thereafter. Vettori asked defendant if he were Jaron; defendant responded affirmatively. (*Id.* at 58) Vettori then turned around and went back into the residence.[8] (*Id.* at 58)

9. Smith ordered defendant to stand so he could commence a pat-down search of defendant's outer clothing. (*Id.* at 18, 35) Smith testified that he conducted the pat-down because: (1) officer safety; (2) the residence was located in a high crime and high drug area; (3) two probationers resided at the residence, one with a gun and drug

---

[8]During the pat-down search of Orron, keys to the residence were discovered. (*Id.* at 48-49) Vettori used the keys to confirm that no one was inside the residence who might pose a threat to officer safety.

4

criminal history; and (4) he believed the defendant was fleeing from the residence. (*Id.* at 18-19). Smith also stated that anyone he detains, he pats-down. (*Id.* at 18, 36) During the pat-down, Smith discovered defendant's identification in a pocket and a firearm in his waistband. (*Id.* at 19, 36-37)

## III. STANDARD OF REVIEW

1. Once a defendant challenges the legality of a warrantless search and seizure, the burden is on the government to demonstrate, by a preponderance of the evidence, that the acts are constitutional. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005); *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

2. The court is charged with reviewing the credibility of witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence. *United States v. McKneely*, 6 F.3d 1447, 1452-53 (10th Cir.1993); *United States v. Williams*, 400 F. Supp.2d 673 (D. Del. 2005).

## IV. DISCUSSION

1. Defendant contends that suppression is warranted because officers did not have reasonable suspicion to believe that he was involved in criminal conduct or that he was armed and dangerous. (D.I. 12, 20) Further, defendant asserts that plaintiff's attempt to invoke the inevitable discovery rule to avoid suppression of evidence is misguided because there was no evidence demonstrating that defendant would have been arrested for ignoring the request to open the door to the residence. (D.I. 20, 19, 21)

5

2. The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures. U.S. Const. Amend. IV. A search and seizure made pursuant to a warrant based on probable cause is generally reasonable. *Katz v. United States*, 389 U.S. 347, 356-357 (1967). However, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, (2009) (quoting *Katz v. United States*, 389 U.S. at 357); *United States v. Mundy*, 621 F. 3d 283, 287 (3d Cir. 2010). Evidence obtained pursuant to a warrantless search that does not meet an exception to the warrant requirement must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006).

2. A police officer may conduct a brief, investigatory stop whenever he has a reasonable articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000). "Reasonable, articulable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, and only a minimal level of objective justification is necessary for a *Terry* stop." *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (quotations and citations omitted).

3. To determine whether a stop was justified, the totality of the circumstances surrounding the stop must be evaluated. *United States v. Bonner*, 363 F.3d 213, 216

(3d Cir. 2004); *United States v. Sokolow*, 490 U.S. 1, 8 (1989). The totality of the circumstances includes the history of crime in the area, the location, the suspect's evasive or nervous behavior and the police officer's conclusions and inferences. *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003). "It is not necessary that the suspect actually have done or is doing anything illegal; reasonable suspicion may be based on acts capable of innocent explanation." *United States v. Whitfield*, 634 F.3d 741, 744 (3d Cir. 2010) (citation and quotation omitted). Essential, however, is whether the circumstances "raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Id.*

4. The court should defer to the officer's observations and judgments in reviewing the totality of the circumstances because officers "draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Nelson*, 284 F.3d. 472, 482 (3d Cir. 2002); *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984). Deference is accorded to an "officer's judgment of whether criminal activity is taking place with an understanding that 'whether an officer has reasonable suspicion to warrant a stop . . . is often an imprecise judgment.'" *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006).

5. Although "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," the law does not require officers "to ignore the relevant

characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citation omitted); *United States v. Goodrich*, 450 F.3d 552, 561-562 (3d Cir. 2006) ("the lateness of the hour of the stop further supports the inference of criminal activity, especially when considered alongside the area's reputation for criminal activity.").

6. Moreover, with respect to unprovoked flight in high crime areas, the Supreme Court has concluded:

> Headlong flight - wherever it occurs - is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

*Wardlow*, 528 U.S. at 124-125; *see United States v. Bonner*, 363 F.3d 213 (3d Cir. 2004). Further, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975)).

7. Considering this authority against the totality of the circumstances of record, the court finds that Smith's stop of defendant was supported by reasonable suspicion. In so doing, the court credits Smith's testimony and concludes it was reasonable to infer that defendant was engaged in criminal activity and posed a danger to officer safety based on: (1) defendant's evasive actions after learning that OSS officers requested entry to the residence; (2) defendant's noncompliance with OSS' request; (3)

8

defendant's immediate exit from the back of the residence via the fire escape staircase instead of the front door; (4) defendant's stuttering and shaking when confronted on the fire escape staircase by Smith; (5) Smith was alone in the dimly lit backyard in an area fraught with crime; (6) Smith did not recognize defendant; and (7) defendant (an unidentified male to Smith) was fleeing the residence and descending steps leading to Smith.

8. Having found the investigatory stop lawful, the court turns to whether Smith reasonably suspected that defendant was armed and dangerous to warrant the pat-down search. *Arizona v. Johnson,* 555 U.S. 323 (2009); *United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir. 2010) (The "stop and the search are independent actions, and each requires its own justification.").

9. The record reflects that the events in the backyard unfolded quickly. After stopping defendant, Smith applied handcuffs and radioed for assistance. At least three OSS officers reported to assist him. When Vettori arrived, he recognized and confirmed defendant's identity. Vettori left the backyard and went inside the residence without ever speaking to Smith about defendant's probationary status.

10. It is undisputed that during a lawful stop, if an officer "has reason to believe that he is dealing with an armed and dangerous individual," he may conduct "a reasonable search for weapons for the protection of the police officer." *United States v. Gatlin*, 613 F.3d 374, 379 (3d Cir. 2010) (citation omitted). The "purpose of this limited search is not to discover evidence of a crime, but to allow the officer to pursue the investigation without the fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972). However, the "pat-down for search for weapons is permitted when the officer is

'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" *United States v. Benitez*, 328 Fed. Appx. 823, 824 (3d Cir. 2009) (unpublished) (citation omitted).

11. The court finds that Smith had reasonable suspicion to conclude that defendant was armed and dangerous; Smith, therefore, acted properly when he frisked defendant. Significantly, "an officer is not required to be absolutely certain that the individual is armed." *Terry*, 392 U.S. at 27. The "test is whether, based on the totality of the circumstances, a reasonably prudent person would be warranted in the belief that his safety or that of others was in danger." *Benitez*, 328 Fed. Appx. at 825. Specifically, the totality of the record reflects that, after the OSS officers announced their presence and requested entry, defendant fled from the residence via a back fire escape staircase. Defendant's presumed destination was into the dimly lit backyard that opened, eventually, into a street. As the lone officer witnessing the events, mindful that the occupants were two probationers living in a crime-filled area, and knowing that the OSS officers' purpose that evening was to arrest and search Orron for a probation violation, Smith was reasonably justified in his concern and decision to conduct a pat-down.

## V. CONCLUSION

At Wilmington this 9th day of November, 2011,

IT IS ORDERED that:

1. Defendant's motion to suppress (D.I. 11) is **denied.**

2. A telephone status conference is scheduled to commence on **Monday, November 28, 2011** at **8:30 a.m.**, with the court initiating said call.

3. The time between this order and the teleconference shall be excludable under the Speedy Trial Act in the interests of justice, 18 U.S.C. § 3161, et seq.

_____
United States District Judge